# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 2, 2025        Decided August 11, 2026

No. 24-1270

CITY UTILITIES OF SPRINGFIELD, MISSOURI, ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

BASIN ELECTRIC POWER COOPERATIVE, ET AL.,
INTERVENORS

———

Consolidated with 24-1282, 24-1283, 24-1285, 24-1372,
25-1007, 25-1023

———

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

———

*Charlotte Taylor* argued the cause for petitioners. With her on the briefs were *James C. Beh*, *Christopher R. Jones*, *Shereen J. Panahi*, *Charles D. Wallace III*, *John P. Coyle*, *Natalie M. Karas*, *Heather H. Starnes*, *Dana Shelton*, *Justin A. Swaim*, and *Ashley Bond*. *Carrie L. Bumgarner* and *Timothy T. Mastrogiacomo* entered appearances.

*Carol J. Banta*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *David L. Morenoff*, Deputy General Counsel, and *Robert H. Solomon*, Solicitor.

*Erin Murphy* argued the cause for intervenors. With her on the brief were *Adrienne E. Clair*, *Nicholas A. Aquart*, *Jesse Halpern*, *Rebecca L. Shelton*, *Kimberly B. Frank*, *Matthew J. Binette*, and *Ruth M. Porter*.

Before: SRINIVASAN, *Chief Judge*, HENDERSON and GARCIA, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARCIA.

GARCIA, *Circuit Judge*: Southwest Power Pool, Inc. operates the electric transmission grid covering much of the central United States. SPP proposed to shift the costs of four electric-transmission facilities, which had been borne primarily by the facilities' local zone, across the broader SPP region. The Federal Energy Regulatory Commission approved that proposal based on evidence that the four facilities are primarily serving and benefiting customers outside of that local zone. Petitioners—utilities, transmission owners, and a state regulator representing affected ratepayers whose costs would increase as a result—argue that FERC's approval was inadequately reasoned and unsupported by substantial evidence. We disagree and deny the petitions for review.

**I**

**A**

The Federal Power Act (FPA) gives FERC authority over the rates governing the interstate transmission of electricity. 16 U.S.C. § 824(b). All such rates must be "just and reasonable" and may not grant any "undue preference or advantage." *Id.* § 824d(a)–(b). The just and reasonable standard "incorporate[s] a 'cost-causation principle.'" *Old Dominion Elec. Coop. v. FERC*, 898 F.3d 1254, 1255 (D.C. Cir.

2018) (quoting *Ala. Elec. Co-op, Inc. v. FERC*, 684 F.2d 20, 27 (D.C. Cir. 1982)).  That principle requires rates to "reflect to some degree the costs actually caused by the customer who must pay them."  *KN Energy Inc. v. FERC*, 968 F.2d 1295, 1300 (D.C. Cir. 1992).

Under Section 205 of the FPA, public utilities may propose "rates and charges."  16 U.S.C. § 824d(c); *see Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 9 (D.C. Cir. 2002).  Those rates and charges are collected in a filing known as a "tariff."  18 C.F.R. § 35.2(c)(1).  The utility proposing a rate change bears the burden of showing that it is "just and reasonable."  *Advanced Energy Mgmt. All. v. FERC*, 860 F.3d 656, 662 (D.C. Cir. 2017) (quoting 16 U.S.C. § 824d(e)).  When presented with such a proposal, FERC plays "an essentially passive and reactive role."  *Id.* (quoting *City of Winnfield v. FERC*, 744 F.2d 871, 875–76 (D.C. Cir. 1984)).  FERC asks whether the new rate would be reasonable, not whether it is "'more or less reasonable' than other possible rate designs."  *N.Y. State Pub. Serv. Comm'n v. FERC*, 104 F.4th 886, 891 (D.C. Cir. 2024) (quoting *City of Bethany v. FERC*, 727 F.2d 1131, 1136 (D.C. Cir. 1984)).  So long as the proposal falls within the "zone of reasonableness," FERC must accept it.  *Id.*

**B**

SPP is a regional transmission organization that operates a large electric-transmission system across the central United States.  It divides its region into eighteen local price zones.  Transmission facilities (such as power lines) move electricity throughout the SPP grid.  A transmission facility's location does not necessarily determine who benefits from its use—an individual facility, for example, might serve power to local customers and to other parts of the SPP region.  These cases concern SPP's efforts to equitably allocate the costs of such facilities throughout the region.

Since 2010, SPP has used the "Highway/Byway" method

to allocate the costs of transmission facilities. *See Sw. Power Pool*, 131 FERC ¶ 61,252, at P 62 (2010), *order on reh'g*, 137 FERC ¶ 61,075 (2011). Highway/Byway uses operating voltage to determine the assignment of facility costs. Facilities operating at 300 kilovolts or above are designated "Highway" facilities—their costs are allocated entirely on a regional basis. *See Sw. Power Pool*, 131 FERC ¶ 61,252, at PP 10, 23. Those operating between 100 and 300 kilovolts are "Byway" facilities—33 percent of their costs are allocated regionwide and 67 percent to the host zone. *Id.* at PP 10, 12, 23. Any remaining facilities operating at or below 100 kilovolts have their costs allocated entirely to the local host zone. *See id.* at P 10. FERC found that method consistent with the cost-causation principle because evidence showed that higher-voltage facilities "tend to support regional power flows" across multiple zones, while lower-voltage facilities "tend to support local power flows within a single . . . SPP zone." *Id.* at P 73.

The Highway/Byway method also includes a periodic review process known as the Regional Cost Allocation Review (RCAR). This process evaluates whether the method continues to produce appropriate long-term benefit-to-cost ratios across SPP's zones. *See Sw. Power Pool*, 189 FERC ¶ 61,128, at P 48 (2024) ("Rehearing Order"). RCAR assesses the Highway/Byway cost allocation at a systemwide and zonal level; the latter serves "to indicate that a zone's benefits are roughly commensurate with the costs allocated to the zone." *Id.* at P 4. RCAR does not assess the costs and benefits of individual facilities. *See id.* at P 48.

The four facilities at issue here lie in the Sunflower Zone, which covers central and western Kansas. SPP originally classified these facilities as Byways based on their operating voltages. *See Sw. Power Pool*, 187 FERC ¶ 61,123, at PP 2, 7 (2024) ("Initial Order"). Later, SPP concluded that, despite that classification, the facilities were increasingly serving a

regional function due to expanding wind generation in the zone. Unlike gas or coal generation, which can typically be sited near the customers it serves, wind generation can be built at scale only where wind resources are abundant. *See* Southwest Power Pool, Inc. Submission of Tariff Revisions, Docket No. ER24-1583-000, at 9 (Mar. 20, 2024) ("March 2024 Filing"). Wind-rich areas therefore may generate more electricity than local demand requires, and some of that surplus electricity ends up being transmitted to customers elsewhere in the region. *See id.* at 9, 11. According to SPP, that is what happened here: Over time, the four facilities increasingly carried power generated in the Sunflower Zone to serve users elsewhere in the SPP region. *See id.* at 11, 28. SPP concluded that, despite their Byway designation, these facilities were providing regional benefits more characteristic of Highway facilities. *See id.* at 28.

SPP set out to correct that misalignment. In 2021, SPP proposed to amend its tariff to allow its board of directors to grant facility-by-facility waivers from the Highway/Byway voltage-based framework. FERC rejected the proposal, reasoning that it gave the board too much discretion without clear standards or sufficient transparency. *See Sw. Power Pool*, 175 FERC ¶ 61,198, at PP 9, 39–40 (2021). SPP then submitted a revised proposal that would channel the power to grant waivers through more specific criteria. *See* Southwest Power Pool, Inc. Submission of Tariff Revisions, FERC Docket No. ER22-1846-000 (May 10, 2022). FERC initially accepted that revision. *See Sw. Power Pool*, 181 FERC ¶ 61,076, at P 1 (2022). But it reversed course on rehearing, concluding that the revised waiver process continued to raise concerns about excessive discretion and inadequate transparency. *See Sw. Power Pool*, 184 FERC ¶ 61,028, at PP 49–52 (2023), *order on reh'g*, 185 FERC ¶ 61,189, at PP 29, 32, 37, 41 (2023). Petitions challenging those orders remain before this court and have been held in abeyance pending resolution of these consolidated petitions. Order, *Sunflower*

*Electric Power Corp. v. FERC*, Nos. 23-1264 et al. (D.C. Cir. Dec. 26, 2024) (per curiam).

Blocked from the waiver route, SPP pursued a different fix in March 2024. Rather than seeking ongoing authority to grant waivers itself, SPP filed a Section 205 proposal asking FERC to approve a prospective reclassification of just the four Sunflower Byway facilities as Highways. *See* March 2024 Filing at 1, 4, 18, 28. Before filing, SPP's Regional State Committee—comprising regulators from twelve states—approved the proposal by an 8-4 vote. *Id.* at 3 & n.8; Sw. Power Pool Reg'l State Comm., *Minutes*, Agenda Item 5 (Oct. 30, 2023), https://perma.cc/4XA8-4YYZ.

To justify that targeted request, SPP relied on the capacity, flow, and benefit criteria it had developed for the 2022 waiver proposal. March 2024 Filing at 28. Together, these criteria aimed to address whether the four facilities functioned more like regional Highway facilities than Byway facilities. The capacity criterion provided zone-wide context: It asked whether generation capacity in the Sunflower Zone that was not tied to serving local customers exceeded the zone's average peak electricity demand during the prior year. *Id.* at 19. The flow criterion then asked, for each facility, whether more than 70 percent of the power flow over that facility attributable to Sunflower Zone generation came from generators not serving local customers. *Id.* at 19–20. The benefit criterion asked whether the facilities provided projected cost savings over a specified threshold to customers outside the Sunflower Zone. *Id.* at 21.

SPP evaluated the four facilities under the above criteria in three separate studies, and FERC found that those studies supplied substantial evidence supporting the proposed regional allocation. Rehearing Order at PP 8, 18. The capacity analyses showed that generation capacity in the Sunflower Zone not tied to serving local customers far exceeded local demand. *Id.* at P 19 & n.67. Specifically, SPP's initial

analysis placed that generation capacity at 364 percent of the zone's average peak demand, and its updated analysis placed it at 338 percent—both well above the 100-percent threshold for satisfying the capacity criterion.   March 2024 Filing at 23, 29. SPP's flow analysis showed that, depending on the facility, between 73.2 and 95.8 percent of the power flow attributable to Sunflower Zone generation came from generators not tied to serving local customers.   Rehearing Order at P 20.   By comparison, the average figure for Byway facilities in the SPP region was "approximately 27 percent."   *Id.*   The benefit analyses likewise showed substantial projected cost savings for customers outside of the Sunflower Zone.   *Id.* at P 21; March 2024 Filing at 21, 26.

FERC concluded that "SPP's analysis shows that, while customers in the Sunflower Zone were paying 67% of the costs for the Sunflower Byway Facilities under the Highway/Byway method, these facilities are primarily being used to serve customers outside the Sunflower Zone."   Rehearing Order at P 22.   The facilities were, in short, "essentially functioning as Highway facilities."   *Id.*

FERC therefore accepted SPP's proposal to prospectively reclassify the four facilities, Initial Order at P 1, and reaffirmed that decision on rehearing, Rehearing Order at P 2.   Petitioners seek review of both orders.

**II**

We review FERC's orders under the Administrative Procedure Act's arbitrary-and-capricious standard.   *See E. Tex. Elec. Coop., Inc. v. FERC*, 90 F.4th 579, 587 (D.C. Cir. 2024) (citing 5 U.S.C. § 706(2)(A)).   We ask whether FERC "examined the relevant data and articulated a rational connection between the facts found and the choice made." *SFPP, L.P. v. FERC*, 967 F.3d 788, 795 (D.C. Cir. 2020) (quoting *ExxonMobil Oil Corp. v. FERC*, 487 F.3d 945, 951 (2007)).   Because ratemaking requires technical judgments

within FERC's expertise, our review is "particularly deferential." *E. Tex. Elec. Coop.,* 90 F.4th at 587. We therefore "may not substitute our own judgment for that of the Commission," or "ask whether FERC's decision is the best one possible or even whether it is better than the alternatives." *Emera Maine v. FERC*, 854 F.3d 9, 22 (D.C. Cir. 2017) (cleaned up).

FERC's factual findings are conclusive when substantial evidence supports them. *See* 16 U.S.C. § 825l(b); *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 54 (D.C. Cir. 2014). That standard requires "more than a scintilla" but "less than a preponderance" of the record evidence. *S.C. Pub. Serv. Auth.*, 762 F.3d at 54 (quoting *Fla. Gas Transm. Co. v. FERC*, 604 F.3d 636, 645 (D.C. Cir. 2010)).

SPP's Section 205 proposal to reclassify the four Sunflower facilities as Highway facilities rested on a simple observation: Although the facilities were classified as Byways under Highway/Byway's voltage criteria, significant evidence showed that they were primarily serving and benefiting customers outside the Sunflower Zone and thus operating as Highways. FERC accepted the proposal on that basis and approved a prospective reallocation of the facilities' remaining costs. Petitioners challenge that conclusion in four ways. None persuades.

**A**

Petitioners first argue that FERC failed to adequately explain why it approved shifting all remaining costs of the four Sunflower facilities regionwide when RCAR showed that the Sunflower Zone was already a net beneficiary of the Highway/Byway system. Recall that SPP periodically reviews the reasonableness of cost allocations under Highway/Byway through RCAR, the zonal review-and-recommendation process. *See* Rehearing Order at P 4. That review generates a cost-benefit ratio for each zone. *Id.* A

ratio below 0.8 indicates an "imbalance" and triggers a process for considering adjustments; such a finding, however, does not mandate that SPP take any particular action to reallocate costs. *See id.*; *see also id.* at P 45.

RCAR analyses have shown favorable results for the Sunflower Zone: Both the 2016 and 2023 reviews showed benefit-to-cost ratios for Sunflower of approximately 3.7. Request for Rehearing of Southwestern Electric Power Company, et al. at 6–7, *Sw. Power Pool*, 189 FERC ¶ 61,128 (No. ER24-1583-001). That figure far exceeded the 0.8 benchmark (though we note that it was below the SPP-wide benefit-to-cost ratio of 5.76 and below the ratios for 11 other SPP zones reported in 2023). *See id.* at 15 fig. 7.1. Petitioners urge that FERC gave those results insufficient weight when approving SPP's request. Doing so, petitioners emphasize, further benefits the Sunflower Zone when RCAR shows it is already a net beneficiary of the Highway/Byway system.

FERC's treatment of the RCAR assessment passes our deferential review. FERC first explained that RCAR's process has never served as the exclusive method for identifying cost imbalances or other grounds for adjusting cost allocation under the Highway/Byway framework. *See* Rehearing Order at PP 47, 51. Petitioners agree with that much. *See* Petitioners' Brief 29. FERC then explained why it gave RCAR's results limited weight when evaluating SPP's proposal. By design, RCAR is a "'big picture' zonal" analysis that does not ask whether the costs of "individual Byway facilities within a zone" are allocated in a manner that is "'roughly commensurate' with the benefits they provide." Rehearing Order at P 48. RCAR and SPP's proposal thus "have different objectives." *Id.* Although both concern the alignment of costs and benefits, they examine that alignment at different levels of generality. Therefore, a favorable zone-wide RCAR ratio does not establish that the costs of each

individual facility within the zone are properly allocated.

FERC's orders recounted at length the strong evidence that these specific facilities were functioning as Highways and delivering substantial benefits outside the Sunflower Zone. *See supra* Section I.B. And FERC concluded that the big-picture, zonal RCAR figure did not require it to deny SPP's facility-specific proposal. *See* Rehearing Order at PP 47–48. FERC could have articulated a more direct affirmative rationale for why the facility-specific adjustment was warranted despite RCAR's results. But this court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Bowman Transp. Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).

Petitioners are surely correct that Sunflower's positive RCAR results are relevant context and at minimum raise the question whether it was *necessary* to reallocate these facilities' costs, given that doing so seems to render the Sunflower Zone even more of a "net winner." Those RCAR results might, conceivably, have supported a finding that the existing Byway cost allocation remained just and reasonable. But whether retaining Byway cost allocation would have been just and reasonable was not the question before FERC, much less the question before this court. Because SPP proposed the reclassification in a Section 205 filing, FERC was deciding only whether that proposal fell within the range of reasonable approaches to the issue. *See N.Y. State Pub. Serv. Comm'n*, 104 F.4th at 891. Our task, in turn, is to assess whether FERC reasonably answered that question in the affirmative. From that perspective, FERC's treatment of the RCAR issue was sufficient. At bottom, the fact that RCAR did not show a zone-wide imbalance did not prohibit FERC from allowing SPP to reclassify facilities that it reasonably found to present a facility-specific cost-benefit imbalance.

**B**

Petitioners next contend that, to comply with the cost-causation principle, FERC should have assessed whether and to what extent the four facilities provide benefits to each of the other 17 SPP zones before permitting the cost reallocation. For purposes of this argument, petitioners assume that SPP showed that these facilities primarily benefited customers outside the Sunflower Zone. But they argue that this aggregate showing was insufficient. Because reclassifying the facilities as Highways would require customers in *each* of the other zones in the SPP region to pay increased costs for those facilities, petitioners say FERC needed to find that the increased costs assigned to *each* zone were roughly commensurate with the benefits that zone received. And because FERC did not do so, petitioners argue that it "misapplied the cost causation principle and acted arbitrarily and capriciously." Petitioners' Brief 36. The result, petitioners warn, is that some non-Sunflower zones may bear increased costs while receiving little or no benefit from the facilities.

FERC reasonably explained its decision not to conduct that granular, zone-by-zone analysis. The cost-causation principle requires that rates "reflect the costs of providing" the service and that "burden" be "matched with benefit." *Old Dominion*, 898 F.3d at 1255 (internal quotation marks omitted). But, as FERC emphasized, the standard is approximate: Costs must be allocated "in a manner that is *roughly* commensurate with [the] benefits received." *Id.* at 1256 (emphasis added) (quoting *Transmission Planning & Cost Allocation by Transmission Owning & Operating Public Utilities*, 76 Fed. Reg. 49,842, 49,932 (Aug. 11, 2011)); *see* Rehearing Order at P 18. Costs need not be allocated with "exacting precision." *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1371 (D.C. Cir. 2004). The costs assessed need only "bear some resemblance" to the benefits received. *Pub. Serv. Elec.*

*& Gas Co. v. FERC* ("*PSEG*"), 989 F.3d 10, 13 (D.C. Cir. 2021).

This approach is reflected in the nature of the very Highway/Byway framework petitioners ask FERC to strictly enforce. That framework assigns individual facilities' costs wholly locally, wholly regionally, or split 67-to-33 percent based entirely on the facilities' operating voltage. *Sw. Power Pool,* 137 FERC ¶ 61,075, at P 2. There is no further accounting for the degree to which each individual zone benefits from a facility deemed a Highway or Byway facility based on voltage. Indeed, when FERC approved the methodology in 2011, it explicitly recognized that SPP was not required to "trace the costs and benefits" of each facility to "individual entities or zones." *Id.* at P 29. The framework thus distinguishes between local and regional cost allocation in broad strokes; it does not attempt to further apportion the regional share of costs among individual zones. Petitioners' insistence that FERC should have assessed costs and benefits zone by zone before approving SPP's proposal is therefore difficult to square with the nature of the Highway/Byway framework itself. *See also Paragould Light & Water Comm'n v. FERC*, 144 F.4th 287, 293 (D.C. Cir. 2025) (recognizing that FERC need not adopt a "hyper-granular approach" when allocating costs in a regional transmission system).

FERC found that regionwide cost allocation was "roughly commensurate" with benefits received "[e]ven assuming arguendo that the distribution of the [facilities'] benefits among individual SPP zones varies." Rehearing Order at P 23. Given that FERC was operating against the backdrop of the Highway/Byway framework, that assessment was reasonable based on the evidence that the facilities were "essentially functioning as Highway[s]," not Byways. *Id.* at P 22. That is, the "facilities [we]re primarily being used to serve customers outside the Sunflower Zone." *Id.* Again, the evidence showed that between 73.2 and 95.8 percent of the

power flowing over these facilities came from generators not serving customers in the Sunflower Zone, compared with approximately 27 percent for Byway facilities generally. *Id.* at P 20. Together with the capacity and benefit analyses, that evidence supported FERC's finding that the facilities primarily served load outside the Sunflower Zone and provided regional benefits far exceeding those reflected in the 33 percent regional cost-allocation for Byway facilities. *See id.* at PP 20, 31.

Given the nature of the Highway/Byway framework, which petitioners do not challenge, the record evidence provided FERC a reasonable basis to conclude that regional cost allocation was roughly commensurate with regional benefits, even without quantifying those benefits zone by zone.

## C

Petitioners next raise an argument based on Order No. 1000's ex ante cost-allocation requirement. That order requires transmission providers to establish in advance the methods used to allocate the costs of facilities selected through regional transmission planning. *See* 76 Fed. Reg. at 49,929. Petitioners contend that FERC departed from that requirement—without acknowledging or adequately explaining the departure—by approving an ad hoc, midstream change to the cost allocation for facilities long classified as Byways.

We disagree. Order No. 1000 does not make every allocation produced under an ex ante method irrevocable, and it did not categorically bar FERC from considering SPP's filing. The order expressly states that its requirement "does not infringe upon a utility's right to propose rates under Section 205 of the FPA." 76 Fed. Reg. at 49,927. FERC made the same point in rejecting petitioners' suggestion that the original Byway allocation was "locked in" for the facilities' operating lives. Rehearing Order at P 59. It explained that Order No. 1000 "does not and cannot constrain SPP's authority to submit

FPA section 205 filings" or prevent FERC from carrying out its statutory duty to ensure that rates remain just and reasonable. *Id.* at P 60.

As FERC noted, we rejected a similar argument in *PSEG*. *Id.* at P 60 n.228. There, we explained that Order No. 1000 requires transmission owners—not FERC—to maintain cost-allocation methods and that no FERC order can "ever trump the plain meaning of a statute." 989 F.3d at 19 (cleaned up). Thus, we held that FERC permissibly ordered a reallocation of the costs of specific facilities notwithstanding a charge that doing so violated Order No. 1000's ex ante principle. *Id.* Petitioners observe that *PSEG* arose under Section 206, under which FERC had first found the existing allocation unjust and unreasonable. *See FirstEnergy Serv. Co. v. FERC*, 758 F.3d 346, 348–49, 353 (D.C. Cir. 2014) (contrasting Section 205 with Section 206, under which FERC—on its own initiative or in response to a complaint—may revise an existing rate only after finding it unlawful). But that difference is immaterial. Because SPP proceeded under Section 205, FERC was not required to first find the existing Byway allocation unlawful. It needed only to determine that SPP's proposed revision was just and reasonable. *See N.Y. State Pub. Serv. Comm'n*, 104 F.4th at 891.

The remaining question is whether FERC adequately explained its approval of this particular adjustment notwithstanding the ex ante principle. It did. FERC acknowledged that principle and emphasized that SPP's filing left Highway/Byway intact and addressed only the prospective allocation of the remaining costs of the four identified facilities. *See* Rehearing Order at PP 58–60. Its decision rested on "specific facts and analyses" showing that fully regional allocation would be "at least roughly commensurate with benefits." *Id.* at P 58.

Petitioners respond that those analyses did not establish a genuinely changed circumstance because Sunflower

anticipated substantial wind development when Highway/Byway was adopted in 2010. But anticipating such development generally did not establish how these particular facilities would later be used. By 2024, installed wind-generation capacity had grown to nearly six times its 2011 level, and SPP's capacity, flow, and benefit studies showed that the four facilities were functioning predominantly as regional assets and providing substantial benefits outside of the Sunflower Zone. FERC thus grounded its decision in evidence of the facilities' current use and benefits. *See id.* at P 43 (explaining that "the record shows that circumstances, and hence the facilities' usage, changed meaningfully").

Petitioners are on firmer ground in warning that repeated facility-specific reallocations could erode the stability and predictability that ex ante allocation is designed to provide. But FERC expressly stated that this proceeding did not "establish a standard process that can be used by various entities going forward," and reaffirmed that Section 205 and the cost-causation principle would constrain any future proposal. *Id.* at P 60–61.

FERC thus adequately addressed the asserted departure from past practice and explained why this limited, prospective reallocation was justified notwithstanding Order No. 1000's ex ante principles. Even assuming the decision marked a departure from prior practice, FERC supplied the requisite "good reasons" for the change. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

**D**

Finally, petitioners challenge FERC's reliance on SPP's capacity, flow, and benefit analyses. We conclude that FERC reasonably treated those analyses as substantial evidence that the four facilities were functioning primarily as regional assets and that petitioners' objections do not establish that FERC acted arbitrarily or capriciously in relying on them.

Our review of FERC's technical judgments in this context is "particularly deferential." *S.C. Pub. Serv. Auth.*, 762 F.3d at 54–55. And, again, the cost-causation principle only requires that allocated costs be "at least roughly commensurate" with benefits and that no party bears costs "grossly disproportionate" to the benefits it receives. *Old Dominion*, 898 F.3d at 1256, 1261. Those principles afford FERC substantial latitude to determine what technical evidence to rely on.

Petitioners first emphasize that the criteria were never incorporated into SPP's tariff. Petitioners contend that the criteria therefore could not support an ad hoc departure from Highway/Byway's voltage-based allocation scheme. But the criteria's absence from the tariff did not prevent FERC from considering the analyses as evidence when evaluating SPP's Section 205 filing. FERC did not treat the criteria as binding rules or endorse them "for all future circumstances." Rehearing Order at P 32. It considered the results of SPP's three studies and determined that they constituted sufficient evidence "in the narrow circumstances of this proceeding." *Id.* Nor did SPP devise the criteria for this filing without prior scrutiny. SPP developed them through a multi-year stakeholder process, and FERC had previously concluded that their substantive focus on capacity, flow, and benefits was consistent with cost-causation principles. *See* March 2024 Filing at 17, 18; Rehearing Order at P 33 & n.124. And FERC's rejection of SPP's earlier proposal does not suggest otherwise. That proposal would have added the criteria to the tariff as part of a new waiver process, but FERC rejected it because of concerns about the process's discretion and transparency, not because it doubted the relevance or reliability of the criteria. *See supra* Section I.B.

Petitioners also raise methodological objections to each of the three criteria. We find no error in FERC's technical judgments.

Start with the capacity analysis. As explained earlier, that analysis provided zone-wide context by showing that generation capacity in the Sunflower Zone not tied to serving local customers substantially exceeded local demand. *See supra* Section I.B. SPP's evidence showed that generation capacity "is *more than triple* the Sunflower Zone's average 12-month . . . load," indicating that the zone had substantial excess generation capacity not tied to local load. Rehearing Order at P 19. Petitioners argue that much of the generation counted in the analysis could not, for technical reasons, have been carried by the four facilities at issue. But the capacity analysis was not designed to establish which facilities carried electricity from that generation. FERC treated this as a threshold finding that showed the zone as a whole had substantial generation available for export; the flow analysis separately supplied the facility-specific link by modeling the flows over each facility. *See, e.g.*, *id.* ("Thus, we continue to find . . . that generation capacity in the Sunflower Zone greatly exceeds the load in that Zone, which, in combination with the flow analyses discussed below, indicates that the Sunflower Byway Facilities provide benefits beyond the Sunflower Zone by allowing that excess generation to serve load in the greater SPP region." (cleaned up)). FERC reasonably considered the capacity analysis for the zone-wide context it provided.

Petitioners next challenge the flow analysis. They argue that attributing flows to particular generators is fundamentally specious because electricity cannot be traced to its source; that regional exports ordinarily travel over higher-voltage Highway facilities; and that SPP's results conflict with the analysis underlying Highway/Byway, which found typical interzonal flows of about 38 percent for facilities operating at 115 to 138 kilovolts. FERC reasonably rejected those arguments based on the specific evidence SPP presented. First, the inability to trace individual electrons to their source did not undermine SPP's modeling, which used technical methods to estimate, for each facility, the share of flow attributable to generation

affiliated or unaffiliated with Sunflower load. *See id.* at PP 20, 33. Petitioners notably did not offer any competing modeling or facility-specific data undermining SPP's results. Second, FERC explained that the general tendency for power to follow higher-voltage paths did not foreclose the possibility of substantial regional flows over lower-voltage facilities, just as SPP's modeling showed. *See id.* at P 37. Similarly, the earlier 38 percent figure reflected the typical regional use of facilities within that voltage range; it did not foreclose a showing that particular facilities would carry substantially greater flows in the future. *See id.*

Finally, petitioners challenge the benefit analysis, which relied on complex production cost modeling to conclude that the four facilities provide benefits to load outside the zone. *See id.* at P 21. Petitioners complain that FERC reached that conclusion only by averaging one projection showing higher costs with another, more optimistic version showing cost reductions. Petitioners characterize the latter as an "aggressive" forecast, but provide us no more specific basis to question FERC's reliance on it. Petitioners' Brief 67.

Taken together, the three analyses provided substantial evidence that the four facilities "are primarily used to serve load outside of the Sunflower Zone and thus benefit the SPP region." Rehearing Order at P 20. Petitioners' objections do not show that FERC acted arbitrarily or capriciously in relying on those analyses.

## III

The petitions for review are denied.

*So ordered.*